And I'll take up the next case, In Interest of D.R., 5-17-0205. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, may it please the opposing counsel, my name is Timothy Hudspeth and I represent the respondent in this matter. This comes before the Court following a termination of parental rights proceeding out of Marion County. Your Honors, we feel that the trial court's ruling, which found it to be in the best interest to terminate my client's parental rights and also which found my client to be unfit to be against the manifest weight of the evidence. Specifically, there were three findings that led to the unfitness finding. This was March 29, 2017. There were four allegations. One was found in favor of my client, the other three against her. Number one was the inability to discharge parental responsibilities. Number two, that she failed to make reasonable progress to correct the conditions that led to the removal of the minor. And number three, that she failed to make reasonable efforts to correct those conditions. The petition to terminate parental rights, as the record shows, alleges two separate nine-month periods, July 23, 2015 to April 22, 2016, and then April 23, 2016 to January 22, 2017. The original reason that the minor was taken from my client had to do with living conditions in the home that they shared with the minor's grandmother and my client's mother. The record shows that there were clearly some issues. In regards to the inability to discharge the parental responsibilities, there was a doctor that testified, a Dr. Kuznicki. He met with my client one time, I believe, roughly three hours was spent with her. He testified during the fitness hearing that there were some deficits in my client's parenting abilities, but he also gave recommendations that she could participate in classes, things she could do, similar to family service plan items, that said if you do these, or if she does these, there could be improvement in her parental abilities. Did you want to explain the living conditions we're talking about in the first part there? I sure can, Judge. Living conditions, there were animals in the house. There was animal feces. Urine? There was urine. The child, when she went, I don't remember if it was school or daycare, but when she went outside the home, it was noted that she had an odor. She was, I believe, afraid to use the restroom. She was of the age where she should have had some fainting. She was born, I believe, in the spring of 2011, June of 11. Petition for wardship was filed May 4th of 2015. So she was somewhere in the range of four years old. So it's kind of a preschool situation? I believe so. I think it may have been a head start. It wasn't actually kindergarten, I don't think. But it was noted that she was afraid to use the restroom was another one of the problems. Was there a problem with the restroom at the house? Like physically a problem with the restroom at the house? I don't know that the record, other than being dirty, I don't know that it didn't work. Is there a record that it was filthy? I don't know that it specified just the restroom itself was filthy. I know it said the rest of the house was. I thought I saw that in the facts. Right. I don't know if it specifically said the restroom was filthy, but it certainly said other areas of the house, bedroom, living room, places like that were dirty. I don't think there was, I don't recall seeing any indication that there was no running water, no plumbing or anything like that. So the conditions were clearly not the best for anyone, let alone a minor child. During the meeting with Dr. Kuznicki, recommendations were made that my client could participate in some counseling classes, participate in some parenting classes, and that that could lead to her parenting abilities being improved. Unfortunately, there was never a time for her to meet with him again for him to say, yes, I did see improvement. Yes, she is better now than she was six months, 12 months ago. His meeting was kind of in the middle of the road as far as the case goes. She had been given a family service plan previously, and she was working at that. But as far as his specific recommendations, he made them once. That was it. He testified in court. These things could happen. See, I'm a little confused. She was at her mother's house. When she went to the doctor, and then she got her own apartment. Is that the situation? That's correct. Originally in May of 15, she was living with her mother. After the child was taken from her, she applied for government housing. That was one of the items called for in her family. So that was denied. The first time it was denied because she wanted to reside with a boyfriend at the time. So that was during that first nine-month period. She was denied. Instead of just saying, oh, well, too bad, she actually got engaged, got married, reapplied. And then during the second nine-month period, she was accepted into government housing. Her caseworker made several visits to the house, said, yeah, there was a few dirty dishes maybe. But otherwise, every indication seemed to be that the house was acceptable. There wasn't anything noted that said that it was dangerous, that it was bad, that there was any sort of animal feces. I thought you said it had some kind of an odor. I think, I guess my interpretation of the odor was maybe a hotel or a public housing odor. I don't know that it said it was anything in particular as far as, you know, rotting garbage, dirty food, dirty animals, or anything like that. The record did say there was some form of an odor, but I don't think that was a basis for the caseworker to say, this house is not acceptable for a child to come and live in. I don't think that was ever shown in the record that once she moved out of Mom's house, she actually did have safe housing. And I think that is something that's key for this court to remember or for this court to keep in mind. The original reason she was removed from my client's care was because of the very bad conditions they were living in. My client tried not just the one time to get out of that house and into public housing. She tried first, wasn't successful, took the step of getting married, and then was actually able to get out of the house. While we do have to consider other things that DCFS and that caseworkers learn as the course goes on when we look at reasonable progress and reasonable efforts, I always think we need to keep in mind what was the primary, the initial reason for the state's involvement. Given that that was the housing conditions, the housing conditions were addressed when she moved out, not to say that public housing was the best living situation, but it certainly seemed as though it was much better than where they came from. And as I said, I don't think there was any indication that it was not an acceptable, safe, and appropriate house. So once she was out of Mom's house and into public housing, she's addressed that number one reason that she was originally brought into the state system, into the courts, and she's taken a very large, very measurable step towards being reunified with her child. In addition to that, I mentioned the things that caseworkers and the courts learn of after the family becomes involved with termination proceedings. There was questions about her own, the mother's own mental and physical health. One of the recommendations was that she address that, as made in the Family Service Plan. She did. Other recommendations were to take parenting classes, to seek counseling. Those were all things that she did. She was very involved with CRC, the Community Resource Center, basically throughout the time, both the first and the second nine-month period. During the, I believe it was during the second nine-month period, is when the petition to terminate parental rights, the original petition was actually filed. That was, I believe, July of 2016. At that point, admittedly, she did have, I would say, a bit of a setback. She didn't do as much as she had been doing at the time. And I would hope that the court can say, well, that's certainly understandable. If you feel as though you're doing everything that's being asked of you, you've been given a list in the Family Service Plan of 20 items. You're seeking counseling. You're doing what you can to move out of mom's house. You're trying to learn better parenting skills. You're trying to get employment or education so that you can ultimately get employment to take care of your child. If you feel as though you're doing all of these things, and somebody says, sorry, no, not good enough, well, I think it's only natural that we're going to have a little bit of a setback. But she did get back up. She continued working towards things. She continued taking her classes. She continued meeting with the counselors that she had been seeing at CRC. There wasn't a time where she just gave up. There wasn't a time where she wasn't doing anything. She was certainly making efforts in both the nine-month periods. Moving on, I guess, from Dr. Kuznicki, from the inability to discharge her parental duties. I feel as though we've covered that. Reasonable efforts. This is a subjective standard. So what is she able to do? Not what can I do or what can some other person do, but what can we actually expect from this person? She was living with her mother. I don't believe that she was employed, given that one of her Family Service Plan items was you've got to get a job, you've got to be able to provide for yourself. She was apparently of limited means and had never really been in that position where she's the person responsible for the family. So she was starting farther back than what some other people we may see in these cases actually start from. She didn't have a strong base to begin with, but she certainly worked to build that base. As I mentioned, it relates to reasonable efforts. My client got her first Family Service Plan, I believe it was in July of 2015, somewhere in that time. Immediately, she started to make those arrangements with the counselors, to get her mental health issues addressed. Her caseworker was working, she was working with her family. She was able to do a mental health evaluation. Some things she was actively able to do on her own, and there were others that somebody was working with her on, that I don't want to say caused any delay, but there's just a process that things have to go through and things take time. Some things were out of her direct control to say, well, I'm going to get this done today. If a caseworker's making an appointment and she has to wait a month, two months to get into that appointment, really that's out of her control, but that shows that she is still, when she goes to that appointment, she's doing what's expected of her. She took parenting classes, some of those I believe were in-home parenting classes, once she got into her public housing apartment. As it relates to the reasonable progress, we get a lot of carryover as far as the actions are. It's an objective standard now, as the court knows. This is not just what can we expect from her, but are there really steps being taken? Are there really steps being taken? Are there things being accomplished that show she is working to get her child back with her? Again, the number one, the biggest thing that she did was she moved out of her mother's house and she got into stable and appropriate housing. For some time, she was going to school. She was attending classes, trying to get a certificate or a degree of one type. She had a job for a short time period. The record, I don't believe, shows or says what happened to that. She lost that job, continued looking, continued working towards finding employment. Later on, one of the final court hearings, I believe, there was testimony that she had decided, well, I'm going to apply for disability, but possibly in part because of Dr. Krasnicki. When he testified, he says that she had a borderline intellectual function. So my limited knowledge of disability is that maybe it may have been the basis. I admit I'm speculating, but she was nevertheless trying to take steps to be able to provide for her family and for her daughter. Once she got married, her husband had a source of income. I believe the record says he was on disability. So they were able to support themselves financially. They had a safe living arrangement. And I think it's clear that she was not doing nothing. She was not sitting back on her heels, expecting everyone to do things for her. She was making a sincere effort through the first nine-month period when she applied for housing and was denied, through the second nine-month period when she applied for housing and was accepted. Continued taking classes, continued her counseling sessions. When she met with Dr. Krasnicki, and even he concluded or he agreed that there were things that she might be able to do that would make her better, help her parental skills, help her abilities. Then we get to the best interest hearing in May of 2017. Once she was found unfit, at that point it kind of turns into not so much a what is wrong with the birth parent, but what do the foster parents bring to the table? And I admit, most foster parents that I see in these cases, they're fantastic. They all do a great job. They do commendable work. So this is not meant to point out their flaws. But I think if we look at the court's ruling, it was very short. The statute… Thank you, Your Honor. Mr. Hudspeth, you'll have an opportunity to reply. May it please the court, counsel. My name is Sharon Shanahan, and I represent the people of the state of Illinois. As our Supreme Court has noted, although a state can rely on several grounds in its petition to terminate parent rights, the finding adverse to the parents of any one of those is sufficient to support a termination order. Now, in this case, there were three grounds alleged, and the state posits that any one of these three was sufficient for the finding of unfitness. Responding first to whether the respondent was unable to discharge their parental responsibilities, found in the records starting at SEC C-187 is an 11-page report by Dr. Frank Kosmicki, who examined the defendant and even her mother. He is a licensed clinical psychologist. He questioned the respondent and her mother, in particular questioning them about Melinda, the respondent's mother, the child's grandmother. Melinda is married to a sex offender. Melinda is married to a man who sexually abused at least one of the respondent's sisters, and there are indications that there were both of them. Nonetheless, the respondent and her mother both say that when he gets out of prison, he's coming back to live in the mother's home, and that they don't see anything wrong with that. The mother sees nothing wrong with her daughter. Now, admittedly, she's not living in her mother's house anymore, but the respondent sees nothing wrong with her daughter being around a sex offender. Dr. Kosmicki also noted that the respondent had a borderline intellectual ability. He noted that her personality test was invalid because she was trying to make a positive impression rather than tell the truth. Touching briefly again on the man that was a sex offender, they both admitted that this sexual contact was when the sister was a minor. They claimed it was consensual, and Dr. Kosmicki was very concerned that the respondent does not seem to understand that Mr. Hunt, the sex offender, might be dangerous to Emily. He noted that she had boundary issues and lacked an understanding of what constitutes consent in minor and adult sex. He noted that the respondent has never cared for herself, much less a child. And counsel for the respondent kept saying, oh, he said she might improve. Here's what he said. To a reasonable degree of clinical psychological certainty, she lacks the ability to provide a stable environment or to provide for herself or her child. He opined that she lacked judgment and insight, especially regarding her views of Mr. Hunt and his sexual assaults of her sisters. He did recommend counseling, parenting training, and assistance in developing daily living skills, but he opined that even if she did these things, even with intensive intervention, his praise, the prognosis as to the respondent's ability to parent is poor. So could she get better? Yes. Could she get better enough to make a difference? No. And there is, although it's kind of a short part of the two things that have to be decided by a psychologist in this, is whether this mental inability is likely to last a significant period of time. And he did say that it was unlikely that there would be appreciable changes over time since her intellectual ability would remain stable. So for this reason alone, Dr. Kosmicki's 11-page report is crystal clear. He says, yes, you know, she tries, but she can't get better, and it's not good enough. Now, I think, as I've said, I think a respondent has misstated this expert opinion of Dr. Kosmicki in the brief where at page 26, a respondent says the doctor was of the opinion that the respondent would be able to continue improving her ability to parent the minor. Page 27, the doctor was clear in his belief that counseling, parenting classes, and daily skills training would improve respondent's ability to parent. But as I say, Dr. Kosmicki said, even if she followed all of his recommendations, there might be some improvement, but it was unlikely that it would be an appreciable change and that even with intensive intervention, the prognosis was poor. So for that reason alone, I believe that this order can stand. I would like to move on to the other two grounds for unfitness, but I want to comment on something. It's in the respondent's brief, and it's been discussed a lot in his opening argument to this court, and that is, well, the reason that she was taken away was because she was in this filthy home. And there's pictures of this place in the record. I mean, there are cat feces everywhere. There's filthy, dirty litter boxes everywhere. This little girl smelled when she went out. The whole place was a mess. I did want to clarify something, Justice Welch. Once she got moved into the public housing, the caseworker did say there was a funny smell in the house, but she didn't, not like there was something wrong with it. I think I would agree with counsel for the respondent that it was probably just one of those public housing smells, cheap motel smells, those kind of smells. But here's the thing. In his brief, the respondent relied on a case called NRASG. Without specifying NRASG to this court, he repeatedly argues, well, she was taken away because she was in this filthy home, and she fixed that. And that's all you need to look at. I mean, he doesn't quite say that, but that's basically what he's saying. She was taken away for this reason, and she fixed that reason. But our Supreme Court has said that's not the situation. Our Supreme Court has rejected this narrow view in NRASCN. They noted that if the legislature intended that reasonable progress be limited to the conditions that were the basis for the removal of the child from the parent, then the legislature could have included language similar to the reasonable efforts basis for removal that says reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent. The Supreme Court also went on to say that it erroneously assumes, such a narrow view erroneously assumes that the condition which triggered the removal of the child is the only condition a parent need ever address in order to achieve the goal of reunification. And finally, it says other serious conditions existing at the time the child is removed may become known only after removal following further investigation of the child, parent, and family situation. So, yes, she was removed because this house was filthy. But that doesn't mean that when she moved out, that fixed everything. The other thing I want to mention is that Counsel for Respondents spends a lot of time saying, oh, she wanted to get, you know, she tried to get into housing and she couldn't, but she kept on trying. She couldn't get into housing because she's living with her boyfriend. She could have gotten into housing if she moved in just by herself. We're looking at reasonableness of actions. If someone's taking your child away from you because you're living in a filthy, dirty place and you've got a chance to move into public housing, that would be acceptable. Move into public housing, get your child back, and then marry your boyfriend. Don't delay one of the requirements of your service plan just because you don't want to live without your boyfriend. But let's look at housing was only one of the requirements for the service plan. And since the service plan is important in both reasonable progress and reasonable effort, I think it's important to look at them. Let's look at the most important one, I think, mental health counseling. Counsel for Respondent and I have a very different opinion on what efforts a respondent make. In the entire 18-month period, the respondent never even came close to completing mental health counseling. She showed up twice for assessments, not counseling, just assessments, and never finished either assessment. She did finish assessments two other times, but the first time she did actually start counseling, but in September 2016 she was discharged unsuccessfully from mental health counseling because she quit attending in July. And she had only been attending the second round of mental health counseling for one month at the end of the second nine-month period. So from the first service plan until the last, respondent was told she needed to complete mental health evaluation and to follow any and all recommendations made as a result of that evaluation, including mental health counseling. She knew this requirement. She didn't even tell her caseworker when she quit. And by the way, that was part of her service plan too. As I said, she did get housing. She could have gotten housing earlier if she had been willing to move into the housing without her boyfriend. As far as parenting classes, Emily was removed from the respondent in May 2015, and the initial service plan went into effect in July 2015. Respondent did not even finish a parenting class assessment until October 2015. She did start parenting classes in November, but she quit before she completed them. And again, in the last few months before the unfitness hearing, she was getting parenting training in her home, but she had not completed it. And I think it's very important that, according to the caseworkers, that despite these classes, there was not a lot of interaction between respondent and Emily. And the caseworker and Dr. Koswicki questioned how bonded Emily and her mother were. The last thing in the service plan was employment. In 18 months, she worked for two weeks. She worked for two weeks. After she got married to her boyfriend, who's receiving SSI, she quit trying to get a job and decided she would apply for SSI. At the unfitness hearing, she had not obtained SSI, and she had not even presented any evidence that she had applied. And I see a flashing light over there. So, rather than get partway into the best interest argument, I'll rely on our brief. Are there any questions? Thank you, Your Honor. Thank you, Your Honors. Just briefly, the counsel's arguments about Dr. Koswicki's reports, while she does correctly state what his report contained, he also testified that he would not have made those suggested recommendations unless he felt they were going to be beneficial. To me, that means if it was a lost cause, if there was no hope for improvement, he would have said something to that effect, or he would not have recommended the steps that she could take. In regards to counsel's argument about the NRA SG and the NRA CN cases, admittedly, the original reason that she was taken out of the home is not the only thing to be addressed or the only thing that she needs to work on. I stated that before, and I want to make sure I'm clear in saying that again. She does have to work on other issues. I believe that under the subjective nature of the reasonable efforts test, during both periods, she did make those reasonable efforts. Counsel made an argument that the respondent was discharged unsuccessfully from mental health counseling because she quit going in July of 2016. As I stated previously, the first petition to terminate parental rights was filed in June of 2016. I think it's reasonable to say, well, if somebody tells me what I'm doing is not good enough, human nature is you're going to have a mental setback. Counsel acknowledged that she did then, closer towards the termination hearings, she did start going again. Even though she may have gotten down, she didn't stop. She might have had to start back from square one, which is not a good scenario for anyone to be in after 12, 14, 16 months. But it shows those efforts are still continuing. As far as any progress, the biggest progress that she made was when she moved out of her mother's home. There were other things that she could progress, other things she could also do. I submit those are things that it takes time, and for one reason or another, she hadn't had sufficient time, or was not able. I don't want to say she hadn't had sufficient time. They just had not been completed. Your Honors, we respectfully request the trial court's orders be reversed as they're against the manifest weight of the evidence. Thank you. Thank you, Counsel. The court will take the matter under advisement and issue a decision in due course. The court will stand in recess until we take up the final case of the morning.